IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 6, 2021 Session

## IN RE MARKUS E.

**Appeal from the Circuit Court for Davidson County**
**No. 16D2220          Philip E. Smith, Judge**

_____

**No. M2019-01079-COA-R3-PT**

_____

A mother and father appeal the termination of their parental rights.  The trial court concluded that there was clear and convincing evidence of two statutory grounds for termination of the mother's rights and one statutory ground for the termination of the father's parental rights.  The trial court also concluded that there was clear and convincing evidence that termination of their parental rights was in their child's best interest.  After a thorough review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Connie Reguli (on appeal), Brentwood, Tennessee, and Lorraine Wade (at trial), Nashville, Tennessee for the appellant, Nakesha M.

Nick Perenich, Nashville, Tennessee, for the appellant, Mark E.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

David R. Grimmett, Franklin, Tennessee, guardian ad litem.

# OPINION

## I.

### A.

On January 10, 2015, the Tennessee Department of Children's Services ("DCS") received an injured child referral. A DCS Child Protective Services investigator arrived at the Vanderbilt Children's Hospital Emergency Department to find seven-month-old Markus sitting in the lap of his mother, Nakesha M. ("Mother"). The child had been sent to Vanderbilt after the clinic of another hospital discovered a rib fracture on the child's x-ray. A skeletal survey performed at Vanderbilt revealed the existence of multiple rib fractures in various stages of healing. Markus also had chronic subdural hemorrhages and was underweight, suggesting nutritional neglect.

The DCS investigator and a police detective spoke with Mother and the child's maternal grandmother, Nadine M. ("Grandmother"). The child's father, Mark E. ("Father"), was out of town. The investigator learned that the child's caretakers were Mother, Father, Grandmother, and a daycare provider. But Mother was the primary caretaker. Mother could not offer a satisfactory explanation for her child's condition.

DCS's initial determination was "that an unknown caretaker caused physical harm to the infant by physical abuse." While the investigation continued, Mother and Father agreed to an immediate protection agreement. Under the agreement, Markus would be placed with relatives, and Mother, Father, Grandmother, and the daycare provider could only have supervised visitation or contact. There would also be no overnight visits.

Markus went through two different safety placements. In April 2015, DCS received a referral that there was a physical altercation between Mother's aunt, who had temporary custody of Markus, and the parents. Allegedly, Markus was injured during the altercation.

Due to the altercation, DCS took custody of Markus and filed a petition in juvenile court for emergency removal and to set child support. DCS contended that Markus was dependent and neglected based on abuse and severe abuse. DCS identified Mother, Father, and Grandmother as perpetrators of the abuse.

DCS developed a family permanency plan with input from both Mother and Father in May 2015. The permanency plan placed several responsibilities on Mother and Father, such as participating in supervised, therapeutic visits; attending anger management and parenting classes; completing a mental health assessment and following any recommendations from the assessment; authorizing release of information from service providers; and maintaining stable housing and employment. Two subsequent permanency

2

plans contained substantially the same requirements. Parents completed the anger management classes, the parenting classes, and participated regularly in the supervised visits. But, even after repeated requests, neither of the parents supplied the family service worker with a mental health assessment.

In late July 2015, the juvenile court held an adjudicatory hearing on DCS's petition. By that time, DCS had elected not to pursue its allegation of abuse against the daycare provider. The juvenile court concluded that there was clear and convincing evidence that Markus was a dependent, neglected, abused, and severely abused child. And it concluded that the perpetrator of the severe abuse was either Mother or Father and one of the two parents willfully failed to protect Markus from the abuse of the other. The court determined the allegation of abuse against Grandmother had not been proven. Mother and Father both appealed the juvenile court's dependency and neglect determination.

B.

While the appeal of the dependency and neglect proceeding was pending, on December 7, 2016, DCS petitioned to terminate Mother's and Father's parental rights. The petition alleged three grounds with regard to both parents: substantial noncompliance with the permanency plans, severe child abuse, and persistence of conditions.

The circuit court[1] conducted a trial over seventeen non-consecutive days spanning sixteen months. The daycare provider testified first. Markus attended her licensed, in-home daycare twice a week, for at least seven hours August 2014 through January 2015. The daycare provider did not see or hear anything to make her suspect that Markus might be injured. And the parents and Grandmother did not report any injuries to her. Markus was in daycare on January 6, but prior to that, he was last in daycare on December 19.

Mother and Father blamed a medical condition for their child's fractured ribs and denied that there had been any kind of accident. They attributed his injuries to his premature birth and his neonatal Graves' disease.[2] Markus spent about three weeks in the Neonatal Intensive Care Unit after his birth. And when he left the hospital, he took medication for Graves' disease for approximately one month thereafter.

Mother recalled testifying in earlier juvenile court proceedings that she heard a crackling noise while he breathed when Markus was three to six months old. When Mother heard the noises, the baby seemed happy and was not fussy. And there were no expressions

---

[1] DCS filed the petition to terminate in juvenile court, but a few months before, Grandmother had filed her own petition in circuit court to terminate Mother's and Father's parental rights. So the juvenile court transferred DCS's petition to circuit court.

[2] Graves' disease is "[a] distinct type of hyperthyroidism caused by an autoimmune destruction of the thyroid gland." *See Graves' disease*, Taber's Cyclopedic Medical Dictionary (21st ed. 2009).

3

of pain. She never heard the noise when she picked him up, just when he was sitting in his chair or sleeping in his crib.

Mother had taken Markus to the doctor multiple times for heavy breathing. Mother took him to the Vanderbilt Emergency Room on Christmas Day because Markus was breathing heavy, coughing, and would not eat. He was sent home after they suctioned his nose. By January 9, Markus had not gotten any better, so Mother took him to a walk-in clinic. He was referred to Vanderbilt where Mother was informed that he had between 19 and 22 rib fractures.

Before January, Father also noticed that Markus was breathing heavily. He was breathing heavily when he first came home from the NICU, and it continued until Markus had his adenoids removed in early 2015. Father maintained that Markus was a happy baby. He did not act as if he was in pain. According to Father, the crackling noise described by Mother was not ongoing. Father heard it one time when the child breathed while Mother was holding the child. He described the sound as similar to the cracking of knuckles. But it was difficult to hear; you had to be very close to hear it. Father first heard the crackling noises before Thanksgiving 2014. He also heard the crackling noise between December 2014 and January 10, 2015.

Prior to January 10, 2015, Mother's work schedule was alternating, three days one week and two days and the weekend the next. Father worked Monday through Friday at two jobs from 7:00 a.m. until 10:00 or 10:30 p.m. He would rarely come home between the two jobs. Father had weekends off. Grandmother cared for Markus when Mother worked on the weekends. Mother could not remember any weekends that Father kept Markus by himself. Father would care for Markus at some point every day. On the weekends, Father usually spent time with Mother and Markus. He was rarely alone with the child; Mother was always there when Father was with the child.

Grandmother testified that she kept the baby while Mother was at work and picked up Markus from daycare on January 6. Grandmother often picked up Markus from daycare after she got off work at 5:00.

Dr. Verena Brown testified by deposition for DCS. After examining Markus on January 10, the emergency room physician called Dr. Brown for a consultation. Dr. Brown was board certified in child abuse pediatrics and a member of Vanderbilt's Child Abuse Response and Evaluation or "CARE" team. In cases of suspected abuse, the CARE team reviewed past medical records, spoke with the parents, and examined the child. The team then tried to identify a medical reason for the child's condition or to determine whether the injuries had been inflicted. Without objection, Dr. Brown testified as an expert in child abuse pediatrics.

Markus's initial skeletal survey on January 10 showed 19 rib fractures in various stages of healing, with the possibility of a few acute fractures. Acute fracture referred to a fracture that had not started to heal. In children, fractures are more easily identified when they start to heal, shown by callus around the bone. According to Dr. Brown, the healing process starts "anywhere from seven to 14 days." So a fracture that had not started to heal could be estimated to be less than seven to 14 days old. Because more recent fractures that have not begun to heal are more difficult to detect, the CARE team always performed a follow up skeletal survey to confirm suspected fractures. The second survey of Markus, completed two weeks later, indicated a total of 22 fractures.

The rib fractures were at various locations of the rib cage, posterior, lateral, and anterior. Dr. Brown described what made rib fractures suggestive of child abuse:

> A. Well, rib fractures in general are compressive injuries. Now, our literature says that it's harder to cause posterior rib fractures, those are the ones in the back, just because of how they're lying in relationship to the spine, than they are anterior rib fractures. So when we see posterior rib fractures, we know that the likelihood of them being inflicted is very high, because it is hard to break those posterior ribs.
>
> . . . .
>
> A. [I]n children with healthy bones, . . . it's actually harder to cause a rib fracture in a child than it is in an adult, because ribs are very compliant, they – it's sort of like if you think about a young tree, stick, you know, versus an old one, older one that's maybe dryer [sic] and easier to break. But in general, the posterior ones are a lot more concerning.
>
> Q. Is this number of rib fractures in a seven-month-old child, is that highly indicative of an abusive injury in particular?
>
> A. Without any other plausible mechanism, such as major, major accidents, in a child with healthy bones then yes, it is indicative of physical injury, physical abuse.

Dr. Brown also gave examples of the force necessary to fracture a child's ribs: "pounc[ing] on a kid's chest," "punch[ing] a kid in the chest," or stomping on a child's chest. She had seen rib fractures after a child was "severely beaten." The "type of force required would be like a TV falling on a kid, not a toy."

The rib fractures could have happened simultaneously from a compression injury. But the type of compression injury required would be "outside the realm of normal

5

parenting." If something fell on the child while he was lying on the floor, that could explain the anterior fractures, but the posterior fractures would be harder to explain.

Dr. Brown did not review medical records of outside providers, but Markus had an extensive medical history at Vanderbilt, beginning with his birth. According to Dr. Brown, neonatal Graves' disease could affect bone density, but any issues would have resolved by the time Markus left the NICU. Dr. Brown found no correlation between his prematurity and the rib fractures. Multiple chest x-rays taken while Markus was in the NICU revealed no fractures.

Vanderbilt tested Markus for osteogenesis imperfecta or brittle bone disease, and the test was negative. Other testing showed that his bone mineralization was normal. Even if he had a bone disease, Dr. Brown testified that 22 rib fractures would be concerning. With a bone disease, long bones, not ribs, typically break. She also testified that the fractures could not have been caused by a severe coughing episode.

Dr. Brown opined that Markus's rib fractures were due to an inflicted injury and that he was an abused child. Although Markus also had subdural hematomas and was underweight when Vanderbilt examined him on January 10, her diagnosis of child abuse was based solely on the rib fractures.

Dr. Jeffrey Bomze, a pediatrician with over 30 years of experience, testified by deposition for Mother. He reviewed the medical records of both Markus and Mother, Dr. Brown's deposition, the records of the agency that provided services to the family, and DCS records. Dr. Bomze did not physically examine the child or conduct any independent tests.

Dr. Bomze agreed with much of Dr. Brown's testimony. He found some discrepancies in the x-ray reports from the first and second skeletal surveys. In his view, the location of the rib fractures as detailed in the two reports did not align, and the description of the fractures as either healing or healed were inconsistent. But he agreed that the tests performed on Markus did not provide a medical explanation for the multiple fractures. And, in his opinion, "more likely than not [the fractures] w[ere] nonaccidental."

Dr. Bomze faulted Vanderbilt and Dr. Brown for not considering other potential explanations for the fractures. Dr. Bomze testified "that there's more possibilities potentially than what were evaluated, especially if you look at Markus as a whole and some of his other unusual features and problems." When asked specifically what other possibilities, he testified, in part, as follows:

> This is not a normal child who just has rib fractures and subdural hematomas. There's other features, as a general pediatrician, that make me look back and say, you know, is there anything more that could be done? And, you know,

6

things do change in time. More tests, more genetic kinds of studies are available in time. The technology is changing rapidly. I – I can't say that there might be something else there.

As for tests that might be performed currently, Dr. Bomze could not identify any, but he persisted "that geneticists in time may be able to come up with something, because there's new and more sophisticated and sensitive technologies." Dr. Bomze did concede that the fact that Markus had no further fractures since leaving Mother's and Father's care strongly suggested that there were no undiagnosed medical explanations for his fractures.

As for Markus's current circumstances, the court heard from his foster mother ("Foster Mother"). Markus was placed with Foster Mother because of her experience with special needs children. When Markus first came to Foster Mother in April 2016, he was taking medication for seizures, walking unbalanced, and tilting his head to the left a lot. The child's left eye slid to the side, and his eyes did not track together. He was congested and "coughy" and very small for his age. He was seeing a neurologist; endocrinologist; ear, nose and throat doctor; and a doctor at the NICU.

While living with Foster Mother, Markus began receiving occupational, speech, and physical therapy. Although one of the family service workers assigned to his case did not think the child would ever talk, Markus began babbling after being with Foster Mother for four or five months. By the time Foster Mother testified at trial, Markus was no longer on any medication and not seeing any medical specialists. He only had typical pediatric appointments and sick appointments. He wore glasses to correct his eye drifts, and he wore orthotics, as recommended by the occupation therapist, to correct "toe walking." He had also not experienced any bone fractures.

Foster Mother described Markus as very active with a sweet disposition and pretty happy. Foster Mother had five other children in her home, and Markus was extremely affectionate with his foster siblings and Foster Mother. He called Foster Mother "Mama" or "Mommy." One of the family service workers also testified to the strong bond between Foster Mother and Markus. Foster Mother hoped to adopt Markus.

The trial court terminated Mother's and Father's parental rights. The court determined that DCS had failed to meet its burden on the ground of persistence of conditions. But the court concluded that there was clear and convincing evidence that both parents had committed severe abuse. The court also concluded that there was clear and convincing evidence of substantial noncompliance with the permanency plan by Mother for not submitting a mental health assessment. And there was clear and convincing evidence that terminating Mother's and Father's parental rights was in the child's best interest.

7

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

On appeal, Mother and Father both argue that the statutory grounds for terminating their parental rights were not supported by clear and convincing evidence.

## 1. Substantial Noncompliance

The petition to terminate alleged substantial noncompliance of the permanency plan by Mother and Father. Among other requirements, the permanency plans required the parents to complete a mental health assessment and follow any and all recommendations. The trial court determined that, although she had completed the other requirements in her permanency plan, Mother's failure to timely submit a mental health evaluation to DCS "weigh[ed] much more heavily than any of the other requirements." So, by not submitting a mental health evaluation, she was in substantial noncompliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2016). The court concluded that DCS failed to prove substantial noncompliance on the part of Father.

Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy were "reasonable and [we]re related to remedying the conditions that necessitate[d] foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

The trial court determined that all of the permanency plan requirements were reasonable and related to remedying the conditions that necessitated foster care placement. We agree that the requirement of a mental health assessment was reasonable and related to remedying the conditions that necessitated foster care placement. The child entered foster care after the failure of two safety placements. The last safety placement ended over a physical altercation between Mother's aunt, who had temporary custody of Markus, and Mother and Father. And Mother and Father lost custody because Markus was diagnosed as being an abused child. A mental health assessment was a necessary step to ensure that there were no mental health obstacles to Mother and Father providing a safe and healthy home environment.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirement to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review

the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

Although Mother challenges the trial court's factual finding that she failed to provide a mental health assessment, the evidence does not preponderate against the finding.[3] We also conclude that the failure to submit the mental health assessment constituted substantial noncompliance with the permanency plan. Although Mother met the majority of the permanency plan requirements, failure to meet one requirement can constitute substantial noncompliance. *See Dep't of Children's Servs. v. Wright*, No. M2008-01607-COA-R3-PT, 2009 WL 302292, at *7 (Tenn. Ct. App. Feb. 6, 2009) (concluding that a parent's "fail[ure] to comply with the single most important requirement of the permanency plan" constituted substantial noncompliance). Here, the mental health assessment was essential to addressing concerns over Mother's ability to care for Markus and to keep him safe.

2. Severe Abuse

At the time the petition to terminate was filed, Tennessee Code Annotated § 36-1-113(g)(4) provided that a parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against the child who is the subject of the petition . . . ." Tenn. Code Ann. § 36-1-113(g)(4) (Supp. 2016). Among other things, "severe child abuse" means "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious injury or death." *Id.* § 37-1-102(b)(22)(A)(i) (Supp. 2016). "Serious bodily injury" includes "a fracture of any bone." *Id.* § 39-15-402(d) (Supp. 2016).

The ground of severe child abuse, like the other grounds for terminating parental rights, must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). But as we have explained,

---

[3] Mother claimed she had completed a mental health assessment and filed proof of its completion with the trial court. The trial court determined that, even if filed with the court, the documentary proof of completion of the assessment could not be admitted into evidence. The documentary proof had not been produced in response to discovery or made available for viewing as a proposed exhibit in accordance with the local rules of court. *See* DAVIDSON COUNTY LOCAL RULE § 29.01 (requiring opposing counsel to meet or hold a telephone conference at least 72 hours prior to trial "to make available for viewing and to discuss proposed exhibits").

[e]ach specific underlying fact need only be established by a preponderance of the evidence.[4] Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury . . . .

*In re S.J.*, 387 S.W.3d 576, 591-592 (Tenn. Ct. App. 2012). We have previously held "[a] parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004).

Here, the evidence does not preponderate against the trial court's finding that the rib fractures were nonaccidental. Dr. Brown opined that the factures were nonaccidental, and even Dr. Bomze agreed that they were likely nonaccidental. Dr. Brown further opined that, absent some "other plausible mechanism," Markus's rib fractures were "indicative of physical injury, physical abuse." Mother and Father argue that there were other plausible mechanisms to explain the injuries. Although their own testimony eliminated accidental trauma as a mechanism, they suggest, as did Dr. Bomze, that there could be a medical condition that made the child's ribs more susceptible to fracture. But they overlook Dr. Brown's testimony that, even with such a medical condition, 22 rib fractures would be concerning.

---

[4] Mother argues that the underlying facts should be proved by "clear, cogent and convincing evidence" in parental termination cases, as advocated by Judge William B. Cain. *See In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *18 (Tenn. Ct. App. June 3, 2003) (Cain, J., concurring). But, as held by our supreme court, we "review the trial court's findings of fact de novo with a presumption of correctness under Tenn. R. App. P. 13(d)." *In re Bernard T.*, 319 S.W.3d at 596.

Mother and Father next claim that the evidence was insufficient to establish that they knowingly inflicted the abuse or knowingly failed to protect their child from abuse. They both denied that they were perpetrators of abuse. And they emphasize that abuse might have occurred while Markus was in the care of Grandmother or their daycare provider.

We conclude that the combined weight of the facts clearly and convincingly show that Mother and Father committed severe abuse. The testimony of the medical experts established that the fractures revealed by the January 10, 2015, skeletal survey occurred during a period when the child was not in daycare. During that time period, Mother and, to a much lesser extent, Grandmother and Father cared for the child. Although both Mother and Father denied abusing Markus, the trial court described Mother's testimony as having "many inconsistencies" and that some of her statements were "mistruths." The court described Father's testimony as only "slightly more creditable than [Mother's]." So the court gave little weight to Mother's testimony and slightly more to Father's testimony. We defer to those credibility assessments. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). And we do not disturb "factual findings based on witness credibility unless clear and convincing evidence supports a different finding." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009).

The court found, despite their denials, that Markus suffered severe child abuse at the hands of Mother and Father. Neither parent questioned the care provided by Grandmother and the daycare provider. And there was no evidence that injuries were self- or accidentally inflicted. The testimony of Dr. Brown established that the fractures occurred on more than one occasion. And the amount of compression needed to cause the rib fractures suffered by Markus was "outside the realm of normal parenting." Only Mother and Father, who agreed that they shared parenting responsibilities, remained as cause of the fractures. Identifying which parent actually applied the force necessary to fracture the child's ribs is not necessary when the facts show, at a minimum, that each parent should have recognized that abuse was occurring. *See In re E.Z.*, E2018-00930-COA-R3-JV, 2019 WL 1380110, at *18 (Tenn. Ct. App. Mar. 26, 2019).

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interest. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Each

factor does not have to favor termination in order to "conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). The relevancy and weight given the statutory factors may vary, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). What does not vary from case to case is the focus of the analysis. The focus is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering the statutory factors, the trial court determined that the termination of Mother's and Father's parental rights was in the child's best interest. The trial court found seven factors weighed in favor of terminating Mother's parental rights and six factors weighed in favor of terminating Father's parental rights.

The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the parent's potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The trial court found both factors favored termination. The evidence does not preponderate against any of the trial court's factual findings. And we agree that the first two statutory factors favor termination of parental rights.

The trial court referenced Mother's failure to get a mental health assessment; the parents' failure to consent to Markus taking doctor recommended vitamins, nutritional supplements, and immunizations; and the significant issues Foster Mother encountered after Markus returned from visits with the parents. Mother and Father had to complete parenting assessments, parenting classes, and anger management classes before visitation could begin. The trial court found that their behavior did not change after the assessments and classes.

The testimony showed that Mother and Father worked against efforts to help Markus. While she was potty-training Markus, Foster Mother asked the parents not to put him in diapers at his visits because it was confusing for him. But he would routinely return from visits in diapers. And, Markus often returned not wearing his orthotic braces. Despite

13

the family service worker explaining the need to keep the orthotics on Markus to the parents, they would not put the orthotics back on him after giving him a bath.

Mother and Father also remained aggressive and confrontational. On one occasion, Foster Mother, fearing a confrontation with Mother, requested that a family service worker follow her to her car. According to Foster Mother, Mother remarked in the child's presence, "'Oh, look at her; she is just concerned I'm going to kidnap you, but it's not time to do that, because this is a short – you're going to be coming home soon.'" On another occasion, Mother chastised Foster Mother for telling Markus "goodbye." Instead, Mother suggested that the she "'just tell him you'll see him later, because he's coming home soon.'"

After one visit at DCS, Father approached Foster Mother and Markus at Foster Mother's car. Foster Mother incorrectly assumed that he might be coming over to say goodbye. Instead, according to Foster Mother, Father pointed at the child and said, indicating to Mother, "'That over there, that's your mama.'" And he told Markus that Foster Mother was not his mama.

The worker in charge of the therapeutic visits requested that visitation be moved to DCS because she feared for her safety. She also asked for security to be present because of the "hostile nature" of the parents.

According to Foster Mother, Markus would need about 36 hours to get back to his normal disposition. He could not sleep the night after he returned and would wake up screaming at 2:00 or 3:00 a.m. He would also hit the other children in the foster home or take their things from them. Afterward, Markus would show remorse and apologize to everyone. Foster Mother testified that it was much harder to redirect him after visits and that he was more demanding and defiant.

The third and fourth factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The trial court did not weigh the third factor in favor of or against termination. But the court determined that the fourth factor did weigh in favor of termination. The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court found that, although the parents had attended visitation regularly, Markus did not remember Mother or Father as his primary caregivers. Markus had been in foster care for over four years and with Foster Mother for three of those years. The child's behavior leading up to and following visits with Mother and Father showed that the relationship between parent and child was strained. We also agree that the fourth factor weighs in favor of termination.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The trial court

14

concluded that this factor weighed in favor of termination. Since his placement with the foster family, Markus had made great strides, both physically and developmentally. And Markus had not suffered any rib fractures since coming to live with Foster Mother. The evidence also showed that Markus had formed a loving bond with Foster Mother and his foster siblings. The fifth factor favored termination.

The sixth factor asks whether the parent or a person residing with the parent "ha[d] shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." *Id.* § 36-1-113(i)(6). The trial court relied on its finding that the parents committed severe abuse in weighing this factor in favor of termination. Based on our conclusion that clear and convincing evidence supported the determination that both parents committed severe child abuse, we agree that this factor weighed in favor of termination.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The trial court again relied on its finding of severe abuse that Mother and Father's home is not safe. Father argues that this factor focuses on the physical environment of the home and was incorrectly applied. We conclude that the trial court correctly applied the seventh factor and weighed it in favor of termination.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The trial court weighed this factor in favor of terminating Mother's parental rights because of her failure to submit a mental health assessment. We agree that this factor weighs in favor of terminating Mother's parental rights.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). Here, the factor weighed against termination because support payments were timely and current.

Here, the combined weight of the proven facts amounts to clear and convincing evidence that termination is in Markus's best interest. While some of the statutory factors might favor maintaining the parent-child relationship, the best interest analysis is not an exercise in determining "whether the sum of the factors tips in favor of or against the parent." *White*, 171 S.W.3d at 194. From the child's perspective, his interests are best served by allowing him to remain in an environment where he is thriving and safe.

15

## III.

The record contains clear and convincing evidence to support terminating both parents' parental rights on the statutory ground of severe abuse and Mother's parental rights on the ground of substantial noncompliance with the permanency plans. The record also contains clear and convincing evidence that termination is in the child's best interest. So we affirm the termination of Mother's and Father's parental rights.

_s/ W. Neal McBrayer_
W. NEAL MCBRAYER, JUDGE
